## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| JUNIOR GARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:14-cv-00978-TWP-MJD |
| ) | |
| CAROLYN COLVIN, Acting Commissioner ) | |
| of Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

### ENTRY ON JUDICIAL REVIEW

Plaintiff Junior Gard ("Mr. Gard") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II and Supplement Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). For the reasons below, the Court **AFFIRMS** the decision of the Commissioner.

### I.    BACKGROUND

**A.    Procedural History**

On June 9, 2011, Mr. Gard filed his application for Title II DIB and Title XVI SSI, alleging a disability onset date of May, 1, 2008. The Commissioner denied the claim by notice of initial determination dated August 16, 2011, and on reconsideration dated December 21, 2011. On January 14, 2012, Mr. Gard filed a request for a hearing. A video hearing was held on October 4, 2012, before Administrative Law Judge Joseph Binkley ("the ALJ"). Mr. Gard appeared in Indianapolis, Indiana and the ALJ presided over the hearing from Falls Church, Virginia. In addition, Ms. Aimee Spinelli, an impartial vocational expert ("the VE"), appeared at the hearing and provided testimony. On November 26, 2012, the ALJ issued a decision denying Mr. Gard

benefits and a timely appeal was filed. On April 25, 2014, the Appeals Council upheld the ALJ's decision and denied Mr. Gard's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.

**B.    Factual Background**

Mr. Gard was 40 years old at the time of his alleged onset date. He has a 12th grade education. Prior to his alleged onset date of May 1, 2008, Mr. Gard worked as a union carpenter and a lawn mower/landscaper. At the time of his hearing, Mr. Gard was 45 years old, he was 6' tall and he weighed 190 pounds. He was divorced and lived with his parents. Mr. Gard is alleging disability due to a removed stomach, spinal stenosis, hypoglycemia and chronic diarrhea.

On December 22, 2008, Mr. Gard had an upper endoscopy that revealed a large prepyloric channel ulcer with a moderate degree of outlet obstruction. On September 8, 2009, he saw Richard C. Strong, M.D. ("Dr. Strong"), and he complained of weight loss, black blood in his stools and abdominal pain. On September 10, 2009, Mr. Gard had an esophagogastroduodenoscopy ("EGD") and blood transfusion, which showed a near-obstructive gastric pyloric channel ulcer with bleeding. On September 14, 2009, an endoscopic examination showed a healing gastric outlet ulcer with an open gastric outlet.

Mr. Gard underwent another EGD with Dr. Strong on October 6, 2010, which showed a pyloric channel ulcer that took up over half of the superior portion of the pyloric channel and duodenal cap. Dr. Strong concluded that surgical intervention was going to be necessary due to his gastric ulcers. On October 13, 2010, Dr. Strong performed a stomach surgery because the ulcers were so severe. Within days of his surgery Mr. Gard was able to eat a regular diet and had regular bowel movements. He was seen for a post-operative visit on November 2, 2010, where he complained of diarrhea, however, he had no abdominal pain, blood in stool, nausea or vomiting.

Mr. Gard also complained of chronic back pain, leg giving out and numbness down his right leg. On March 10, 2011, he complained that his back pain shoots into his hip and leg. Early medical records show that he had cervical decompression fusion surgery which he tolerated well and after which he returned to work. During the March 2011 examination, Mr. Gard had weakness in his right toes, spasm and tenderness in the paravertebral spine with limited range of motion in all planes. The doctor diagnosed right lumber radiculopathy that he suspected was at L5 vertebra. Mr. Gard informed his doctor that he wanted to avoid surgery.

On June 8, 2011, Mr. Gard saw Ravishankar Vedantam, M.D. ("Dr. Vedantam") of Midwest Spine Surgeons. Mr. Gard was experiencing low back pain and weakness, with his legs giving way, and reported that he had used a cane for a few weeks. He also complained of nausea, vomiting, stomach pain, ulcers, diarrhea, shortness of breath, fever, chills, swollen ankles, headaches, and low blood sugar. He reported that he could stand and walk without pain for less than ten minutes. Dr. Vedantam noted that Mr. Gard has neurogenic claudication of the lower extremities due to severe lumbar spinal canal stenosis at multiple levels. The doctor also noted Mr. Gard had pallor and suspected he was anemic.

On August 5, 2011, Abou Mazdai, M.D. ("Dr. Mazdai") conducted a consultative examination at the request of the state agency. On examination, Mr. Gard was alert, awake, and well-nourished, he walked without assistive devices, and he had a normal gait and station. Dr. Mazdai noted a limited range of motion in Mr. Gard's cervical spine but he concluded that his physical ability was fairly good. Mr. Gard had neurogenic claudication of the lower extremities due to severe lumbar spinal canal stenosis, a problem with his previous gastric surgery which resulted in the dumping syndrome, and could have been a little anemic; he was a heavy smoker

3

and addicted to tobacco. On examination, he was 167 pounds, 6 feet 1 inch tall, and his Body Mass Index was 22.5.

On August 8, 2011, Mr. Gard saw Dr. Vedantam for a follow-up evaluation. He complained about his back and lower extremity pain. Sitting down and lying down relieved his back pain. Dr. Vedantam noted that Mr. Gard had thoracolumbar scoliosis. His straight leg raise test on the right leg was positive. Dr. Vedantam noted that x-rays showed right lumbar scoliosis and lateral listhesis of the L3 over L4 vertebrae and the L2 over L3 vertebrae. He diagnosed Mr. Gard with lumbago, spinal stenosis, lumbosacral spondylosis and acquired spondylolisthesis. He commented that Mr. Gard "has significant lumbar spinal pathology" and comorbidities including chronic anemia and nicotine addiction.

On August 11, 2011, Mr. Gard was seen for his fatigue. He had received two units of red blood cells on July 13, 2011. An EGD did not reveal any source of bleeding. Mr. Gard had less absorption due to his stomach surgery and he would likely need to receive IV iron infusion on a regular basis. He was told to stop the oral iron because his body was not absorbing it.

On August 16, 2011, Jonathan Sands, M.D. ("Dr. Sands"), a state agency medical expert, reviewed Mr. Gard's entire claim file and completed a Physical Residual Functional Capacity Assessment form. Dr. Sands opined that Mr. Gard could lift and carry twenty pounds occasionally and ten pounds frequently; he could stand and/or walk for at least two hours in an eight-hour workday and could sit for about six hours in an eight-hour workday. Dr. Sands stated Mr. Gard had mostly occasional postural limitations. On December 21, 2011, Dr. Mark Ruiz, M.D. reviewed the file and affirmed the opinion of Dr. Sands.

On August 30, 2011, Mr. Gard complained of headaches which Michael Williamson D.O. ("Dr. Williamson") felt were likely rebound headaches. Mr. Gard reported taking six to eight

4

Excedrin per day. He reported some improved energy with his B12 injection and some improvement with his headaches. A colonoscopy was ordered. Dr. Williamson noted that Mr. Gard continued to suffer from profound fatigue. He was not eligible for another blood transfusion because his hemoglobin was 11. On September 12, Mr. Gard had a normal colonoscopy.

Dr. Bain referred Mr. Gard to Dr. Adam Rosenfeld ("Dr. Rosenfeld") for a hypoglycemia consultation. During his November 17, 2011, Mr. Gard reported that his blood sugars were in the 40s and that even after eating, it might only get into the 60s or 80s. He reported drinking a lot of Mountain Dew, orange juice and milk to try to maintain a normal blood sugar level. He also said he ate a lot of peanut butter. Mr. Gard reported requiring B12 shots and IV iron infusion since surgery. Mr. Gard's weight got as low as 140 pounds. Dr. Rosenfeld noted that a consultation with a nutritionist would benefit Mr. Gard as Mr. Gard stated has been difficult for him to wean off all the Mountain Dew.

On January 5 and January 10, 2012, Mr. Gard was seen about his anemia and abdominal pain and testing was ordered. On February 6, 2012, Mr. Gard was seen by Catherine Bain, M.D. ("Dr. Bain"), who diagnosed him with hypoglycemia, which was markedly improved with diet. Dr. Bain explained his condition would be aggravated by his drinking of Mountain Dew. Dr. Bain also noted that Mr. Gard looked fatigued and pale. On January 18, 2012, Mr. Gard had an endoscopy due to food in the lower third of his esophagus and large amounts of food residue in the stomach. On January 31, 201, Mr. Gard had an EGD and colonoscopy.

On February 6, 2012, Mr. Gard saw the doctor about hypoglycemia. He was started on medication due to excess fat in his stool. This medication improved his diarrhea. Mr. Gard had decreased his Mountain Dew consumption and his episodes of hypoglycemia were decreasing to

approximately twice weekly. An x-ray on February 22, 2012 showed lumbar scoliosis with degenerative changes.

On April 11, 2012, Douglas J. Kaderabek, M.D. ("Dr. Kaderabek") reported that Mr. Gard had persistent marginal ulcer disease and possible gastric outlet obstruction. One of Dr. Kaderabek's concerns was that Mr. Gard smoked approximately two packs of cigarettes daily, which in his opinion, prevented healing of marginal ulcers. Dr. Kaderabek would not operate on Mr. Gard while he continued to smoke cigarettes.

On July 17, 2012, Mr. Gard was seen by Bruce Ippel, M.D. ("Dr. Ippel"). He told Dr. Ippel that the physical therapy he was doing at home seemed to help, but he still had sharp pain, especially when he tried to clean himself after a bowel movement. Dr. Ippel prescribed a trial of Cymbalta for possible help with depression and pain. On August 28, 2012, Mr. Gard told Dr. Ippel that he had low back pain radiating into his sciatic region. On examination, the doctor noted that his back was moderately tender in the upper lumbar right paraspinal region, and straight leg raise testing was mildly positive with an okay gait.

At the hearing, in response to the ALJ's hypothetical, the VE testified that given Mr. Gard's age, education, work experience, and residual functional capacity, Mr. Gard would be able to perform light work in occupations such as an information clerk and a surveillance monitor.

## II. DISABILITY AND STANDARD OF REVIEW

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any

other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled, despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e. one that significantly limits his ability to perform basic work activities) that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

In order to determine steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), which is the "maximum that a claimant can still do despite [his] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546

F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III.     THE ALJ'S DECISION

As an initial matter, the ALJ found that Mr. Gard meets the insured status requirements of the Act through March 31, 2012, for purposes of DIB and SSI. The ALJ then began the five-step evaluation process. At step one, the ALJ found that Mr. Gard had not engaged in substantial gainful activity since May 1, 2008, his alleged onset date. At step two, the ALJ found that Mr. Gard had the following severe impairments: anemia, celiac disease, status-post cervical decompression fusion surgery, status-post gastric ulcer surgery, scoliosis, lumbosacral spondylosis, lumbar stenosis, sciatica, and depression. At step three, the ALJ found that Mr. Gard does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded that Mr. Gard has the residual functional capacity to perform light work, except that he must: have a sit-stand option with sitting up to one hour at a time without interruption, for total of

seven hours with interruptions and stand/walk for one half-hour at a time without interruptions for total of six hours with interruptions, in addition to regularly scheduled breaks. Mr. Gard is limited to occasional bilateral overhead reaching, stooping, kneeling and climbing stairs/ramps. Mr. Gard cannot crawl or climb ladders, ropes, or scaffolds, must avoid concentrated exposure to extreme cold/hot, wetness, humidity vibrations, and work hazards such as unprotected heights, dangerous machinery and uneven terrain. Mr. Gard should be afforded unimpeded access to nearby restrooms during regularly scheduled breaks, perform unskilled work without assembly line or production rate quota jobs, and be limited to occasional use of the right-dominant upper extremities for fingering, grasping, handling and touching without any such limitations regarding the use of the left upper extremities. At step four, the ALJ determined that Mr. Gard is unable to perform any past relevant work as a carpenter and a mower. Because the ALJ concluded that Mr. Gard has not been under a disability, as defined in the Act, from May 1, 2008 through the date of this decision, Mr. Gard's requests for DIB and SSI were denied.

### IV.   DISCUSSION

In his request for judicial review, Mr. Gard raises four issues, which he believes constitute reversible error. First, Mr. Gard alleges that the ALJ's analysis of his gastrointestinal impairments is not supported by substantial evidence and did not exclude the possibility of a closed period allowance. Second, Mr. Gard contends that the ALJ's credibility determination is not supported by substantial evidence. Third, Mr. Gard argues that substantial evidence does not support the ALJ's conclusion that he could sustain work at the assessed RFC. Finally, Mr. Gard argues that the ALJ's vocational analysis is not supported by substantial evidence.

**A.    The ALJ's analysis of Mr. Gard's gastrointestinal impairments is supported by substantial evidence.**

Mr. Gard contends that the ALJ's findings erroneously summarized that his numerous conditions have responded to the various amount of treatment that Mr. Gard has obtained. (Filing No. 17, at ECF p. 20.) He also contends that the ALJ blamed his hypoglycemia on his diet and Mountain Dew consumption. (Filing No. 17, at ECF p. 21.) In response, Mr. Gard argues that the ALJ failed to mention that even with improvements to his conditions, he still experiences hypoglycemic episodes and gastrointestinal problems that severely limited his daily activities. (Filing No. 17, at ECF p. 20.) He also states that although the gastrointestinal problems were not severely limiting during the hearing, the records indicate severe gastrointestinal disorder from December 22, 2008 to March 26, 2012, when he underwent an upper endoscopy that showed a moderate degree of outlet obstruction. (Filing No. 17, at ECF p. 20; Filing No. 14-7, at ECF p. 80; Filing No. 15-4, at ECF p. 35.) Mr. Gard further explained that his hypoglycemia is related to his gastrointestinal disorders. (Filing No. 17, at ECF p. 21.)

Mr. Gard's position is well taken, however the Court is not persuaded. The ALJ discusses with particularity Mr. Gard's hypoglycemia and gastrointestinal issues. The ALJ states that the medical evidence of record fails to substantiate his subjective allegations and testimony to the degree Mr. Gard reported. (Filing No. 14-2, at ECF p. 24.) The ALJ cites to evidence from Dr. Strong's examination, who ordered an EGD that revealed a gastric ulcer. (Filing No. 14-7, at ECF pp. 30-31.) Following stomach surgery, Dr. Strong stated that Mr. Gard did well post-operatively and within days of surgery ate a regular diet and had regular bowel movements. (Filing No. 14-8, at ECF p. 95.) The ALJ further acknowledged that Mr. Gard had continued diarrhea, but that he did not have abdominal pain, blood in stool, change in appetite, constipation, rectal bleeding, nausea or vomiting. (Filing No. 14-2, at ECF p. 24; Filing No. 14-8, at ECF p. 93.)

The ALJ cites to evidence from Dr. Rosenfeld noting that Mr. Gard's gastrointestinal condition was stable. (Filing No. 14-8, at ECF p. 37; Filing No. 15-4, at ECF p. 3). The ALJ also noted that Mr. Gard saw Dr. Bain due to episodes of hypoglycemia with some diarrhea, chills, fatigue, fainting spells, excessive sweating and hot flashes. (Filing No. 14-7, At ECF p. 111.) However, the ALJ also cites to evidence that when Mr. Gard's hypoglycemia episodes occurred, he was consuming at least twelve cans of Mountain Dew per day and orange juice, and ate peanut butter sandwiches or crackers. (*Id*.; Filing No. 14-2, at ECF p. 25.) Dr. Bain noted that he would benefit from a nutritional consultation and an improved diet. Dr. Bain later reported that Mr. Gard had an improved diet and as a result, his hypoglycemia was much less frequent. (Filing No. 14-8, at ECF p. 37; Filing No. 15-9, at ECF p. 20.)

The ALJ's analysis of Mr. Gard's gastrointestinal impairments is supported by substantial evidence and his decision reflects his analysis.

**B.    The ALJ's credibility determination is supported by substantial evidence.**

Mr. Gard contends that the ALJ focused on his diet, use of a non-prescribed cane, lack of desire to have surgery, and smoking when making his credibility determination. (Filing No. 17, at ECF p. 22.) Specifically, Mr. Gard argues that the ALJ cherry-picked the evidence to analyze when making his decision. (*Id.*) Mr. Gard argues that it is unfair to focus on his diet prior to consultation with the dietician, and that he could walk without assistance at the outset of the alleged disabilities. (*Id.*) Mr. Gard states that his conditions worsened over time.

The factors Mr. Gard list are part of analyzing the credibility of the degree of disability alleged. The ALJ cites to specific evidence that diminishes Mr. Gard's credibility. (Filing No. 14-2, at ECF p. 25.) Dr. Bain and Dr. Rosenfeld both reported that Mr. Gard's hypoglycemic condition improved when his nutrition increased. (Filing No. 15-4, at ECF p. 5.) Mr. Gard's

11

overconsumption of Mountain Dew, orange juice and peanut butter sandwiches early on contributed to his hypoglycemic episodes. The medical reports noted that Mr. Gard continued to drink the beverages even after nutritional counseling and that once he changed his diet, Mr. Gard's symptoms and episodes lessened.

The medical reports also show that Mr. Gard continued to smoke cigarettes, which contributed to a slow to non-existent healing period. The ALJ cites to evidence from Dr. Kaderabek and Dr. Vedantam noting that Mr. Gard smoked two packs of cigarettes per day and that it would impede the healing process of his ulcers, and that it will have a "deleterious effect on the degenerative spine" and a possibility of nonunion after lumbar spinal surgery. (Filing No. 14-2, at ECF p. 25; Filing No. 14-7, at ECF p. 16; Filing No. 15-15, at ECF p. 14.) Although the smoking lessened, Mr. Gard still continued to smoke on a regular basis. Dr. Ippel also suggested that Mr. Gard cease tobacco use for improvements. (Filing No. 14-2, at ECF p. 26; Filing No. 15-5, at ECF p. 37.) Dr. Mazdai later reported that Mr. Gard was still a heavy smoker despite being advised to stop. (Filing No. 14-2, at ECF p. 26; Filing No. 14-7, at ECF p. 16.) Aside from the diet and smoking habit, Mr. Gard also declined to have surgery and would also use a non-prescribed cane.

The ALJ cites to evidence from Dr. Jamie Bradbury, who noted that Mr. Gard had a somewhat antalgic gait with a cane for which he did not have a prescription. (Filing No. 14-2, at ECF p. 26; Filing No. 15-5, at ECF p. 16.) However, Dr. Mazdai reported that although Mr. Gard had some difficulty squatting, tenderness to the palpation of the lumbar spine, decreased range of motion in cervical spine and positive straight leg raising, he did have a normal hand grip, could bend without difficulty, his pulses were normal and he could walk on his heels and toes without difficulty. (Filing No. 14-2, at ECF p. 26; Filing No. 14-7, at ECF p. 8.)

The ALJ specifically states that he does not find Mr. Gard credible because his medical reports on all of his conditions were inconsistent with his testimony during the hearing. (Filing No. 14-2, at ECF p. 27, ¶ 5.) Mr. Gard initially walked without assistance, then began using a non-prescriptive cane, and admitted that he still smoked two packs of cigarettes per day against the doctors' advice. The ALJ found that Mr. Gard had only mild restriction in daily living activities and that he appeared to be able-bodied. (Filing No. 14-2, at ECF p. 27, ¶ 4.) He could dress independently, mowed his lawn with the riding mower, had no issues socially, and could drive short distances, shop for groceries and visit his daughter weekly. (*Id*.) The ALJ found Mr. Gard's statements concerning the intensity, persistence, and limiting effects of his symptoms to be not credible to the extent they are inconsistent with the residual capacity assessment as determined by the ALJ. (Filing No. 14-2, at ECF p. 27, ¶ 3.) The ALJ further explains that Drs. Strong's, Rosenfeld's and Williamson's treatment notes are not inconsistent with the RFC and that great weight was given to Dr. Kaderabek's, Dr. Vedantam's and Dr. Ippel's notes on the importance of smoking cessation and the effects of continuing to smoke would have on possible surgery and continual improvement. (Filing No. 14-2, at ECF p. 28.) The medical evidence further supports the decision of the ALJ on Mr. Gard's credibility, therefore the Court does not find the credibility assessment patently wrong.

**C.    Substantial evidence supports the ALJ's RFC assessment.**

Mr. Gard argues that the ALJ failed to support his RFC assessment with substantial evidence. (Filing No. 17, at ECF p. 24.) Specifically, Mr. Gard argues the ALJ did not address the impact of his limitations related to attendance or task completion due to missed productivity as a result of hypoglycemic episodes or fatigue related to anemia or any of Mr. Gard's other impairments. (*Id*.) Mr. Gard also argues that the ALJ did not consider his headaches to be a severe

impairment and that determination is not harmless error. (*Id*.) However, Mr. Gard does not describe or cite to evidence of the limitations he claims the ALJ overlooked, or what direct impact the stated evidence would have on his RFC.  The ALJ accounted for Mr. Gard's limitations, including limitations in standing, walking, environment, movement and areas of work. (Filing No. 14-2, at ECF p. 23.)  The ALJ also addressed the medical evidence that contradicted Mr. Gard's claims about the severity of his pain.  (Filing No. 14-2, at ECF p. 24.)  Therefore, the Court finds that the ALJ supported his RFC assessment with substantial evidence.

**D.      The ALJ's vocational analysis is supported by substantial evidence.**

Finally, Mr. Gard alleges that the surveillance system monitor job noted by the VE, is not consistent with the ALJ's limitations on Mr. Gard's use of his dominant hand. (Filing No. 17, at ECF p. 24.)  Mr. Gard argues that the job has changed dramatically since the Dictionary of Occupational Titles (the "DOT") was last updated and it can no longer be performed at the unskilled level. (*Id*.)  He also claims that the information clerk position requires a greater skill level than Mr. Gard has because the DOT indicates that it has a reasoning level of three. Specifically, Mr. Gard states that a level 3 job is inconsistent with the limitation to unskilled work. (*Id*.) However, the ALJ relied on substantial evidence when analyzing the VE's testimony.  The ALJ relied on SSR 00-4p as well as the Medical-Vocational Guidelines and the DOT to help determine whether the VE's testimony was consistent.  (Filing No. 14-2, at ECF p. 29.)  The ALJ also considered Mr. Gard's age, education, work experience, and RFC in making his determination. (*Id*.)  Furthermore, the Seventh Circuit has rejected the argument that a reasoning level of three was necessarily inconsistent with a finding that a claimant could perform only "simple work." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).  Therefore, conflict due to a change in requisite skill is not apparent and it would not justify remand of the case on this bases.

14

## V.     CONCLUSION

For the reasons set forth above, the Court finds the final decision of the Commissioner is **AFFIRMED**. Mr. Gard's appeal is **DISMISSED**.

**SO ORDERED.**

Date: 8/5/2015

*Tanya Walton Pratt*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jonelle L. Redelman
REDELMAN LAW
jonelle@redelmanlaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov